IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

DOEHLER NORTH AMERICA, INC.,

    Plaintiff,

v.

RUSSELL LEE DAVIS and
CROSSKEYS ASSOCIATES LIMITED,

    Defendants.

Civil Action No. 22-501-RGA

## MEMORANDUM

Before me is Defendants' motion to dismiss for failure to state a claim. (D.I. 24). I have fully considered the parties' briefing. (D.I. 25, 32, 34). For the reasons set forth below, Defendants' motion is GRANTED in part and DENIED in part.

### I. BACKGROUND

This is a dispute among members of an LLC. Plaintiff Doehler North America Inc. ("DNA") filed suit against Defendants Russell Lee Davis and Crosskeys Associates Limited ("CKAL") seeking injunctive relief and damages under the Agreement Among Initial Members of Doehler Dry Ingredients Solutions, LLC ("Member Agreement") and the Operating Agreement of Doehler Dry Ingredients Solutions, LLC ("Operating Agreement") (D.I. 2 at 14-17; D.I. 2-1, Ex. A-B). The action concerns membership units of Doehler Dry Ingredients Solutions, LLC ("DDIS"),[1] a company involved in the freeze-dried fruit and vegetable business. (D.I. 2 at 6-7).

---

[1] The name of DDIS is the subject of some confusion. (*Compare* D.I. 2 at 2, D.I. 2-1, Ex. A-1 at 1, *and* D.I. 25 at 1, *with* D.I. 2-1, Ex. B at 1 *et passim*, *and* D.I. 32 at 1.) Consistent with my previous order (D.I. 21), I adopt the style Plaintiff uses in its Complaint: Doehler Dry *Ingredients* Solutions, LLC.

1

Mr. Davis, CKAL, and others entered into the Member Agreement to provide for the "start-up and early and middle-stage management and processes of and for" DDIS. (D.I. 2 at 7; D.I. 2-1, Ex. A-1 at 1). DDIS, DNA, Mr. Davis, CKAL, and others entered into the Operating Agreement "to set out fully their respective rights, obligations, and duties regarding" DDIS. (D.I. 2-1, Ex. B at 1). Plaintiff's copies of these Agreements indicate that they were executed on the same day, November 1, 2017, and that the Member Agreement was amended on November 15, 2017. (D.I. 2-1, Ex. A-1 at 1, Ex. A-2 at 1, Ex. B at 1). Defendants dispute the dating of the Member Agreement. (D.I. 15 at 12).

On January 26, 2022, DNA delivered notice to CKAL that it wished to exercise its right to purchase CKAL's units of DDS—totaling twenty-five percent of the total units of DDIS—under the cross-transfer purchase provisions of the Operating Agreement. (D.I. 2 at 9). On February 15, CKAL responded that it would not comply with this request. (*Id.* at 10). On March 25, Mr. Davis sent an email ("the Email") directing recipients—which included "employees, consultants, customers, clients, vendors, distributors, and/or suppliers of DDIS and/or DNA (or its Affiliates)" (*id.* at 14)—to contact Mr. Davis and others at external email addresses, as their internal email addresses "have been compromised." (*Id.* at 12). The parties dispute the factual circumstances of these communications. (D.I. 2 at 11-14; D.I. 15 at 14-15). Plaintiff sent Mr. Davis a cease-and-desist notice on March 29, and Mr. Davis replied in writing on April 6, indicating his refusal to comply. (D.I. 2 at 13). This action was filed on April 20. (D.I. 2).[2]

One day later, Defendants filed an action in the Delaware Court of Chancery seeking the dissolution and winding up of DDIS. *In re: Dissolution of Doehler Dry Ingredient Solutions, LLC*, Del. Ch. C.A. No. 2022-0354. The Court dismissed the action. *In re: Dissolution of Doehler Dry*

---

[2] This Court has jurisdiction by virtue of diversity of citizenship.

*Ingredient Solutions, LLC*, 2022 WL 4281841, at *9 (Del Ch. Sept. 15, 2022). On March 14, 2023, the Supreme Court of Delaware entered an order affirming the judgment. (D.I. 41-1).

## II.   LEGAL STANDARD

When reviewing a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6), the Court must accept the complaint's factual allegations as true. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007). Rule 8(a) requires "a short and plain statement of the claim showing that the pleader is entitled to relief." *Id.* at 555. The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements. *Id.* ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."). Moreover, there must be sufficient factual matter to state a facially plausible claim to relief. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (cleaned up)).

## III.   DISCUSSION

The Complaint has two counts. The first is a claim that Mr. Davis breached the Member Agreement. The second is a claim that Mr. Davis and CKAL breached the Operating Agreement.

### A.   Breach of the Member Agreement

Defendants advance two arguments for why Plaintiff has failed to state a claim for breach of contract of the Member Agreement. Defendants' first argument is that Mr. Davis is not bound by the relevant provision of the Member Agreement. (D.I. 25 at 8-9). Defendants' second argument

is that, even if Mr. Davis is bound, Plaintiff has not alleged that Mr. Davis breached that provision. (*Id.* at 10-12). I agree with the second argument.

To adequately plead breach of contract, Plaintiff must show (1) the existence of a contract, (2) "the breach of an obligation imposed by that contract," and (3) resulting damage to it. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). I must read the contract as a whole and enforce its plain meaning. *Manti Holdings, LLC v. Authentix Acquisition Co.*, 261 A.3d 1199, 1208 (Del. 2021).

Plaintiff alleges, "By sending the Email, Davis is in direct breach of Section 5(c) of the Member Agreement and has caused damage to DNA by his breach, as he has interfered with or attempted to interfere with the relations and/or arrangements of DDIS and/or DNA with their employees by contacting such employees with the false claim of a data breach." (D.I. 2 at 15). The relevant portion of the Member Agreement reads:

> [D]uring the term of this Agreement and for a period of three (3) years thereafter . . . each of CKAL and Russell Davis hereby covenants and agrees that it and he shall not, directly or indirectly, either for itself or himself or some other person or entity, through any person: (i) recruit, solicit, entice, or persuade (or attempt to do the foregoing) any person who is an employee, consultant, vendor, or supplier to the Company or DNA (or its Affiliates) to leave the services of the Company or of DNA (or its Affiliates) for any reason, (ii) hire, or attempt to hire any person who is already an employee of the Company or of DNA (or its Affiliates); or (iii) **interfere or attempt to interfere with the relations or arrangements of the Company or DNA (or its Affiliates) with any person who is an employee, consultant, employee [sic], customer, client, vendor, distributor or supplier of the Company or DNA (or its Affiliates).**

(D.I. 2-1, Ex. A-1 at 4) (emphasis added).

### 1. Integration Clause

Defendants' first argument is that Mr. Davis is not bound by the Member Agreement because the Member Agreement is a "prior agreement" superseded by an integration clause in the Operating Agreement. (*Id.* at 8-9). This clause, Section 15(c), provides that the Operating

4

Agreement "contains the entire agreement of the parties, and supersedes all prior oral and written agreements, with respect to the transactions contemplated hereby." (D.I. 2-1, Ex. B at 29).

Under Delaware law, "a binding and completely integrated agreement 'discharges prior agreements to the extent that they are within its scope.'" *Focus Financial Partners, LLC v. Holsopple*, 241 A.3d 784, 822 (Del. Ch. 2020) ((quoting Restatement (Second) of Contracts § 213 (Am. L. Inst. 1981)). "Clauses indicating that the contract is an expression of the parties' final intentions generally create a presumption of integration." *Addy v. Piedmonte*, 2009 WL 707641, at *9 (Del. Ch. 2009). Section 15(c) of the Operating Agreement is one such clause and is therefore entitled to that presumption.

The trouble with Defendants' argument is that the Member Agreement is not a "prior agreement" within the ambit of Section 15(c). "[I]n construing the legal obligations created by [a] document, it is appropriate for the court to consider not only the language of that document but also the language of contracts among the same parties executed or amended as of the same date that deal with related matters." *Crown Books Corp. v. Bookstop Inc.*, 1990 WL 26166, at *1 (Del. Ch. Feb. 28, 1990). Under Delaware law, "related contemporaneous documents should be read together" as one contract. *Ashall Homes Ltd. v. ROK Entertainment Group Inc.*, 992 A.2d 1239, 1250 (Del. Ch. 2010); *see also* 11 SAMUEL WILLISTON & RICHARD A. LORD, A TREATISE ON THE LAW OF CONTRACTS § 30:26 (4th ed. 2022) ("[T]he principle that all writings which are part of the same transaction are interpreted together also applies when incorporation by reference of another writing may be inferred from the context surrounding the execution of the writings in question.").

The Member Agreement was executed on the same day as the Operating Agreement and deals with "additional" aspects of the same underlying matter—that is, the establishment of the rights, obligations, and duties of members with respect to DDIS. (*See* D.I. 2-1, Ex. A-1 at 1, Ex. B

5

at 1). As Plaintiff notes (D.I. 32 at 12-13), the Member Agreement contains multiple express cross-references to the Operating Agreement. (*E.g.*, D.I. 2-1, Ex. A-1 at 1, 3, 4, 6, 7, 8, 9). For example, the first page of the Member Agreement provides that "the Initial Members have duly entered into the Operating Agreement" (*id.* at 1), and that terms not defined in the Member Agreement shall be defined in the Operating Agreement. *Id.* The Member Agreement also refers numerous times to obligations set out in the Operating Agreement. (*E.g.*, *id.* at 3, 4, 6, 7, 8, 9).

In sum, the apparent intention of the parties was to execute the Member Agreement and the Operating Agreement contemporaneously. I am therefore inclined to agree with Plaintiff that "the Member Agreement and the Operating Agreement together form parts of an integrated transaction." (D.I. 32 at 13). Thus, I conclude that the integration clause in the Operating Agreement does not supersede the Member Agreement, and that, consequently, Defendants are bound by the terms of the Member Agreement.

## 2. Breach of Section 5(c)

Defendants' second argument is that, even if the terms of the Member Agreement are binding, Plaintiff has failed to allege a breach of Section 5(c) of the Member Agreement. (D.I. 24 at 10-12). I agree.

Section 5(c) of the Member Agreement provides, in relevant part, that Defendants "shall not ... interfere or attempt to interfere with the relations or arrangements of [DDIS] or DNA (or its Affiliates) with any person who is an employee, consultant, employee [sic], customer, client, vendor, distributor or supplier of [DDIS] or DNA (or its Affiliates)." (D.I. 2-1, Ex. A-1 at 4). Plaintiff alleges that Mr. Davis breached this provision by sending the Email. (D.I. 2 at 13). Per the Complaint, the Email informed recipients—which included "employees, consultants, customers, clients, vendors, distributors, and/or suppliers of DDIS and/or DNA (or its Affiliates)"

(*id.* at 14)—that the internal email addresses of Mr. Davis and two others "have been compromised." (*Id.* at 12). The Email directed the recipients to contact Mr. Davis and the two others at a separate set of email addresses, and to ignore any responses to emails sent to the internal addresses within the preceding 24 hours, as those emails "could end up in the wrong hands." (*Id.*).

According to Plaintiff, Mr. Davis sent the Email to maximize his bargaining position with respect to the purchase of CKAL's units. (*Id.* at 11-12). Defendants contend that Mr. Davis's Email was a reasonable response to an actual hacking attempt, and therefore not a breach. (D.I. 25 at 10-12). Plaintiff responds, "Davis's motives for his interference are beside the point." (D.I. 32 at 14). I think that, even if I were to accept Plaintiff's argument that Mr. Davis's motives are immaterial, Plaintiff has not sufficiently alleged that the Email constitutes a breach of Section 5(c).

In short, it is unclear from the Complaint how the Email constituted interference, or an attempt to interfere, with the business relations of DDIS or DNA. Plaintiff offers two primary arguments regarding Mr. Davis's breach of this provision.[3] First, Plaintiff alleges that Mr. Davis interfered with or attempted to interfere with the business relations of DDIS and/or DNA by "contacting third parties with whom DDIS and/or DNA engages in business with the false claim of a data breach." (*Id.* at 15). Plaintiffs do not explain how the statements in the Email might interfere with the business relationships between DDIS or DNA and the Email's recipients. Plaintiff stresses that the Email implied the existence of a "third-party, external data breach." (D.I.

---

[3] Plaintiff also alleges that Davis "used a separate entity he controls, Integrity Foods, to engage in transactions with companies in other countries, such as Egypt and China, within the same market and industry as that in which DNA and DDIS operate." (D.I. 2 at 15). I cannot tell from the Complaint how this alleged conduct violates the Member Agreement. Section 5(c) does not broadly prohibit engaging in transactions with companies within the same market and industry as DDIS or DNA. (*See* D.I. 2-1, Ex. A-1 at 4). In any event, the parties do not discuss this allegation in their briefing. Instead, they center their argument and analysis on the Email. I do the same here.

7

32 at 15; D.I. 2 at 13). Plaintiff's theory, as I understand it, is that the Email suggested that DDIS's email servers and other systems are vulnerable, and that such a suggestion harms the reputation of DDIS and/or DNA. The Email, however, suggested little more than that three email accounts were compromised by an unauthorized party. I do not think that this is enough to damage any relevant business relationships. Second, Plaintiff alleges that the Email constituted an attempt to "divert email traffic from proper DDIS email addresses and domains to email addresses and domains created and maintained by Davis." (D.I. 2 at 12-13). Nowhere in the Complaint does Plaintiff indicate how a proposed substitution of email addresses might interfere with the business relationships between DDIS and/or DNA and the Email's recipients.[4] Thus, I do not think that this allegation is sufficient either.

For the reasons stated above, I conclude that Plaintiff has failed to adequately allege that Mr. Davis breached the Member Agreement. I therefore grant Defendants' motion to dismiss Count I.

### B. Breach of the Operating Agreement

Plaintiff alleges that Defendants "[have] not acted in good faith and [are] in direct breach of Section 9(f)(ii) of the Operating Agreement" because CKAL refused to sell its units to DNA and Mr. Davis refused to cause CKAL to do so. (D.I. 2 at 17). Section 9(f)(ii) provides:

> (ii)   Purchase Rights.   Notwithstanding any other provision in this Operating Agreement to the contrary, during the Cross-Transfer Period [January 1, 2022 to December 31, 2023], DNA shall have the right to require CKAL and Garry Beckett, in one transaction,

---

[4] In its opening brief in support of its earlier motion for a temporary restraining order, Plaintiff indicated that the Email facilitated the diversion of "email communication with DDIS's customers and suppliers" to "email addresses and domains solely controlled by Davis or CKAL," which could leave DDIS "unable to effectively communicate with its employees, customers, and suppliers" and therefore "effectively ... unable to manage its business at all." (D.I. 6 at 16).
I was not convinced by this explanation with respect to the motion for a temporary restraining order. (*See* D.I. 21 at 8-9). I am not convinced with respect to this motion, either.

>to sell to DNA and/or its Affiliates, all of their respective Units, at the Cross-Transfer Price and under the terms as set forth in Sections 9(g) and 9(h) hereinbelow.

(D.I. 2-1, Ex. B at 20).

Defendants argue that Count II should be dismissed because the "Cross-Transfer Price" pricing formula referred to in Section 9(f)(ii) is "ambiguous,"[5] and, because "Plaintiff has not satisfied its burden of proving this ambiguous term," Plaintiff "cannot prove that Defendants breached the Operating Agreement for failing to accept a purchase price that is still disputed based on undefined terms in a contract." (D.I. 25 at 13).

I agree with Plaintiff that ambiguity in the provision at issue is not a basis for dismissal. (D.I. 32 at 16). As Plaintiff says, "provided [Plaintiff's] proffered interpretation is reasonable, the Court may not credit Defendants' competing interpretations on a motion to dismiss." (*Id.*). Indeed, "[a]t the motion to dismiss stage, the Court 'cannot choose between two differing reasonable interpretations of ambiguous provisions.'" *Markow v. Synageva Biopharma Corp.*, 2016 WL 1613419, at *5 (Del. Super. Ct. Mar. 3, 2016) (quoting *VLIW Tech., LLC v. Hewlett–Packard Co.*, 840 A.2d 606, 615 (Del. 2003)). "In other words, '[d]ismissal is proper only if the defendant['s] interpretation is the *only* reasonable construction as a matter of law.'" *Id.* (quoting *Vanderbilt Income & Growth Assocs., L.L.C. v. Arvida/JMB Managers, Inc.*, 691 A.2d 609, 613 (Del. 1996)).

---

[5] Section 9(h) of the Operating Agreement provides that the Cross-Transfer Price is calculated as follows:

> P = [X * EBITDA − Company's Net Debt] * percentage Unit holding of Cross-Transferring Member;
>
> where P is defined as the Cross-Purchase Price, and the EBITDA is defined as the normalized two-year average EBITDA of the Company during the two most recent financial years of the Company.

(D.I. 2-1, Ex. B at 22). Defendants dispute the meaning of the term "Company's Net Debt." (D.I. 24 at 12).

9

"'[W]hen parties present differing—but reasonable—interpretations of a contract term, the Court turns to extrinsic evidence to understand the parties' agreement. Such an inquiry cannot proceed on a motion to dismiss.'" *Id.* (quoting *Remo Grp., Inc. v. MacAndrews AMG Hldgs., LLC*, 2015 WL 394011, at *5 (Del. Ch. Jan. 29, 2015)). Defendants' authorities do not suggest otherwise. *Bohler-Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 102 (3d Cir. 2001) (analyzing the burden of proof of establishing the meaning of ambiguous contractual terms in the context of jury instructions); *Pharmacy Corp. of Am./Askari Consol. Litig.*, 2020 WL 5369191, *4 (D. Del. Sept. 8, 2020) (setting forth general standards for assessing contractual ambiguity in the context of post-trial briefing), *aff'd*, 2022 WL 3697342 (3d Cir. Aug. 26, 2022).

Here, Defendants have not argued that that Plaintiff's interpretation of Section 9(f)(ii) of the Operating Agreement is an unreasonable one. All Defendants argue is that other reasonable interpretations of that provision exist.[6] (*See* D.I. 25 at 12-13). As explained above, this is insufficient.

I therefore deny Defendants' motion to dismiss Count II on this basis.

### C. Availability of Relief

Defendants also contend that I should dismiss both counts, as Plaintiff has failed to request any relief that this Court may grant. (*Id.* at 13-17). I disagree.

Defendants' first argument is that Plaintiff's breach of contract claim pursuant to Section 9(f)(ii) of the Operating Agreement does not warrant specific performance. (D.I. 25 at 14-15). "A party seeking specific performance must establish that (1) a valid contract exists, (2) he is ready,

---

[6] Defendants make additional arguments in their reply brief. (*See* D.I. 34 at 3-4). As Defendants failed to raise these arguments in their opening brief, I decline to consider them here. "Arguments raised for the first time before a district court in a reply brief are deemed forfeited." *In re Niaspan Antitrust Litig.*, 2023 WL 3243532, at *12 (3d Cir. Apr. 24, 2023).

10

willing, and able to perform, and (3) that the balance of equities tips in favor of the party seeking performance." *Snow Phipps Group, LLC v. KCAKE Acquisition, Inc.*, 2021 WL 1714202, at *51 (Del. Ch. Apr. 30, 2021) (cleaned up). Specific performance is only available if there is no adequate remedy at law. *White v. Russell*, 2023 WL 3191746, at *6 (Del. Ch. May 2, 2023).

Defendants stress that specific performance is a discretionary remedy, and that, in light of the ambiguity of the Operating Agreement's pricing formula and Defendants' "many defenses and counterclaims," Plaintiff has failed to demonstrate that it is entitled to such an award. (*Id.* at 14). I agree with Plaintiff that Defendants "confuse 'whether [Plaintiff] will ultimately prevail, [with] whether [Plaintiff] is entitled to offer evidence to support the claims.'" (D.I. 32 at 18 (quoting *Thibault v. Delaware Tech. & Cmty. Coll.*, 2012 WL 2073847, *1 (D. Del. June 8, 2012)). The authorities upon which Defendants rely concern burdens of proof at later stages of the litigation, rather than at the motion to dismiss stage. *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1158 (Del. 2010) (reviewing a final judgment post-trial); *Mehiel v. Solo Cup Co.*, 2005 WL 1252348, at *7 (Del. Ch. May 13, 2005) (summary judgment).

Defendants also say that specific performance is unavailable because Plaintiff did not adequately allege that Defendants failed to "use good faith efforts" to perform its obligations to sell its units. (*Id.* at 14-15). Defendants rely on Section (9)(g)(vi) of the Operating Agreement, which provides:

> (vi) If any Member fails to use good faith efforts to perform its obligations to sell its Units or to purchase the Units of the other Member(s), as applicable, pursuant to the terms of this Section 9(g) on or prior to the Cross-Transfer Deadline, then, **in addition to any other rights the non-breaching Member(s) may have at law or in equity**, the non-breaching Member(s) may pursue injunctive relief without recourse to arbitration and without the necessity of posting bond or other security or proving or showing damages. All of the Members acknowledge and agree that such a remedy is proper, since a breach of their respective obligations under Section 9(g) may cause irreparable damage.

11

(D.I. 2-1, Ex. B at 21-22) (emphasis added). As the emphasized portion indicates, this provision provides an additional remedy; it does not impose a limit on the bases upon which Plaintiff may seek injunctive relief. Thus, the relevant question here is not whether Plaintiff can obtain the remedy of specific performance under the requirements of this one provision, but whether Plaintiff can obtain the remedy of specific performance, generally. I think that the answer is yes. As Plaintiff notes, Delaware courts "ha[ve] not hesitated to order specific performance in cases of this nature [involving the purchase of ownership interests in a company], particularly where sophisticated parties represented by sophisticated counsel stipulate that specific performance would be an appropriate remedy in the event of breach." (D.I. 32 at 19-20 (quoting *Snow Phipps*, 2021 WL 1714202, at *51.)) And I agree with Plaintiff that it has pleaded sufficient facts in its complaint as to each element of specific performance under Delaware law; it has alleged the existence of the Operating Agreement (*e.g.*, D.I. 2 at 2, 7), Plaintiff's willingness to perform its obligations under the cross-transfer purchase provisions (*see id.* at 8-11), and facts that tip the balance of the equities in Plaintiff's favor, such as inequitable conduct by Mr. Davis. (*See, e.g., id.* at 8-13). I am therefore unconvinced by Defendants' argument with respect to specific performance.

Defendants' second argument is that Plaintiff did not adequately allege entitlement to damages on both counts. (D.I. 25 at 15-17). As discussed, I do not think that Plaintiff has sufficiently alleged that Mr. Davis breached the Member Agreement, and so I do not address Defendants' contentions with respect to Count I. These contentions constitute the bulk of Defendants' argument; Defendants focus on Plaintiff's claims of reputational harm resulting from the Email, which pertain only to Count I. (*See id.*). As for Count II, I am not convinced that money damages are unavailable. Under Delaware law, "[a] party need not plead cognizable damages," as "[a]ll that is required is cognizable harm, and the breach of a contract right gives rise to cognizable

harm." *In re P3 Health Group Holdings, LLC*, 2022 WL 16548567, at *30 (Del. Ch. Oct. 31, 2022); *Garfield on behalf of ODP Corporation v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022) ("[A] plaintiff need not plead monetary damages to sustain a breach of contract claim. The plaintiff need only plead causally related harm, which the plaintiff can accomplish by pleading a violation of the plaintiff's contractual rights.").

Thus, Defendants' arguments with respect to damages fail as well. Accordingly, I deny Defendants' motion to dismiss Count II.

## IV.   CONCLUSION

An appropriate order will issue.

harm." *In re P3 Health Group Holdings, LLC*, 2022 WL 16548567, at *30 (Del. Ch. Oct. 31, 2022); *Garfield on behalf of ODP Corporation v. Allen*, 277 A.3d 296, 328 (Del. Ch. 2022) ("[A] plaintiff need not plead monetary damages to sustain a breach of contract claim. The plaintiff need only plead causally related harm, which the plaintiff can accomplish by pleading a violation of the plaintiff's contractual rights.").

Thus, Defendants' arguments with respect to damages fail as well. Accordingly, I deny Defendants' motion to dismiss Count II.

## IV.  CONCLUSION

An appropriate order will issue.

*[signature]*
United States District Judge